U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
FEB 14 2020
CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CARLOS KIDD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:19-CV-113-Z |
| | § | |
| DIRECTOR OF THE FEDERAL | § | |
| BUREAU OF PRISONS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# MEMORANDUM OPINION DISMISSING COMPLAINT
# AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER

This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining Order, filed May 23, 2019 (ECF No. 3-1) ("Motion for TRO").[1] Plaintiff moves for a temporary restraining order against Defendants to: (1) prevent Defendants from housing Plaintiff in administrative segregation; (2) compel Defendants to transfer him out of the prison unit in which he currently resides; and (3) require Defendants to place him in state protective custody or federal custody in order to ensure his protection from retaliation and prison violence.

Having reviewed the Motion for TRO and all its exhibits, the Court concludes that Plaintiff cannot satisfy any of the four legal requirements for issuance of a temporary restraining order ("TRO"). The Court therefore DENIES Plaintiff's motion for a TRO. Because Plaintiff and the

---

[1] Plaintiff's handwritten motion is entitled "Motion for **Tempory** Restraining Order," but the motion was entered onto the docket by the clerk's office as "Motion for **Temporary** Restraining Order." *Compare* Motion for Tempory Restraining Order 1, filed May 23, 2019 (ECF No. 3-1), *with* Docket Entry for ECF No. 4. Throughout his motion, Plaintiff repeatedly requests a "temporary restraining order" or "TRO." *See, e.g.*, Motion for Temporary Restraining Order ¶¶ 48–50, at 28. The Court here interprets the title of the filed motion as a typographical error and – borrowing the concept of scrivener's errors from statutory interpretation – interprets Plaintiff's petition as one for a "Temporary Restraining Order."

Court both understand the Complaint to be coextensive with the Motion for TRO, the Court also DISMISSES the Complaint.[2]

**BACKGROUND**

Plaintiff is an inmate at the Bill Clements state prison in Amarillo, Texas ("Clements Unit"). *See* Complaint at 1 & 7. He asserts that a prison guard raped him in 2003, and that he reported this alleged rape to superior prison officials. Motion for TRO ¶¶ 1-2, at 1-2. According to Plaintiff, this prison guard was fired on account of the report. Motion for TRO ¶ 2, at 2. As Plaintiff recalls the facts, this prison guard long had smuggled contraband into the prison for other inmates, which caused prison gangs to target Plaintiff for violence throughout the subsequent seventeen years. *See* Motion for TRO ¶ 2, at 2. Plaintiff alleges that fellow prisoners have assaulted him numerous times and routinely issue death threats against him, but prison officials ignore his reports and requests for protection. *See* Motion for TRO ¶¶ 2-5, at 2-3. Even worse, Plaintiff avers that prison officials at the Clements Unit themselves actively facilitate other prisoners' access to him so that the latter can beat and rape him. *See* Motion for TRO ¶¶ 6-7, at 3.

After Plaintiff wrote to the American Civil Liberties Union ("ACLU") to advise the organization of his purported plight, Plaintiff contends that the director of the Clements Unit transferred Plaintiff into protective custody. *See* Motion for TRO ¶¶ 8-9, at 4. Plaintiff states that the move to protective custody did little to stymie fellow inmates — particularly those belonging to the Aryan Brotherhood prison gang — from making attempts on Plaintiff's life. *See* Motion for TRO ¶ 10, at 4-5. Plaintiff avers that the ACLU demanded of the prison director that Plaintiff be

---

[2] Plaintiff filed the Motion for TRO as an exhibit to his Complaint. *See* Docket Entry for ECF No. 4. In the section of the Complaint in which Plaintiff stated his claim, he asked the Court: "Please accept my Motion for TRO as my complaint, because the contents of that motion is [sic] the same as in a seperate [sic] written complaint. (See attached Motion for TRO.)" Prisoner's Civil Rights Complaint § 5, at 4, filed May 23, 2019 (ECF No. 3) ("Complaint"). Based upon its independent analysis of the papers, the Court agrees with Plaintiff that the two documents are coextensive.

2

transferred to federal custody or otherwise afforded a greater degree of security than state protective custody provides. *See id.* Plaintiff claims that Clements Unit prison officials disregarded the ACLU's intervention. *See id.*

Plaintiff describes reaching such a point of desperation about his situation that he seized an opportunity in 2005 to escape from a prison van en route to receiving treatment at a hospital. *See* Motion for TRO ¶ 11, at 5-6.[3] Authorities recaptured Plaintiff in short order, but not before what Plaintiff characterizes as extensive international media coverage of his escape. According to Plaintiff, the episode reflected badly on security protocols at the prison and embarrassed the director of the Clements Unit. *See* Motion for TRO ¶ 12, at 6. In what Plaintiff interprets as a retaliatory act, the director thereafter reassigned Plaintiff from protective custody to administrative segregation — an even riskier prison environment — with the malicious intent of subjecting Plaintiff to both physical assault and "psychological and emotion torture." Motion for TRO ¶¶ 13-14, at 6-7.

Ever since his 2005 recapture and transfer to administrative segregation, Plaintiff asserts that he has been caught in a viscous cycle: inmates and prison staff alike physically and sexually abuse him, he files grievances, the grievances are ignored, and the abuse intensifies. *See* Motion for TRO ¶¶ 14-15, at 7-8. Over the past fourteen years, Plaintiff alleges, he has been transferred to a different prison at least eighteen times but continues to be assaulted by inmates and prison officials wherever he is housed. Motion for TRO ¶ 16, at 8-9.

---

[3] Plaintiff nowhere in his Motion for TRO indicates when the attempted prison escape occurred. According to his offender profile on the TDCJ website, Plaintiff escaped from the prison van on November 1, 2005. *See* Offender Information Details: Carlos Ray Kidd, Texas Dep't of Crim. Just., https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action?sid=06533958 (last accessed Feb. 14, 2020). This timeline comports with Plaintiff's assertions in a petition for writ of habeas corpus that he filed in a 2012 case in this Court. *See Kidd v. Thaler,* Petition for Habeas Corpus Under 28 U.S.C. § 2241, 5:12-cv-00238-C (ECF No. 1), filed December 21, 2012. The Court therefore takes judicial notice of the date of the offense, as the accuracy of the database cannot reasonably be questioned and Plaintiff himself asserted this fact in a separate and unrelated petition more than seven years ago. *See* FED. R. EVID. 201(b).

Plaintiff in 2006 and again in 2018 unsuccessfully petitioned the Court for injunctive relief to stop this purported cycle of abuse.[4] He repeated substantially the same claims in each instance, as recounted in his present Motion for TRO. Across both petitions for injunctive relief, Plaintiff argued that he was in imminent and grave danger from retaliation from the Aryan Brotherhood and was buffeted by unremitting threats from gang members and prison guards. Plaintiff stated he had received ongoing threats to his life, despite numerous transfers to various state facilities across Texas, and in each instance requested to be transferred to federal custody or placed back into protective custody. Plaintiff claimed — repeatedly — that Defendants failed to protect him from threats and violence. The Court dismissed the 2006 case without prejudice for failure to prosecute. It denied Plaintiff's requested injunctive relief in 2018, and the United States Court of Appeals for the Fifth Circuit dismissed Plaintiff's appeal for want of prosecution.

Now Plaintiff comes to the Court with a new Motion for TRO on the substantively same grounds and seeking the same relief as in his motions for injunctive relief in 2006 and 2018. Attendant to his Motion for TRO, Plaintiff has filed four additional motions: (1) Motion for an Independent Psychological Evaluation; (2) Motion for Euthanasia; (3) Motion for Emergency Hearing; and (4) Motion for Expedited Review of Plaintiff's Motion for Temporary Restraining Order. In the first motion, Plaintiff requests that the Court order a psychological evaluation by a psychologist not employed by TDCJ to assess Plaintiff's risk of suicide, which he asserts the abuse has heightened. *See* Motion for Independent Psychological Evaluation 1, filed May 23, 2019 (ECF No. 5). In the second motion, Plaintiff requests that the Court "grant him a painless, [sic] and

---

[4] In 2006, Plaintiff filed a case based on the same allegations in *Kidd v. Livingston et al*, 2:06-cv-00205-J-BB (dismissed without prejudice for failure to prosecute). In 2018, Plaintiff filed in the Wichita Falls Division a Motion for Emergency Injunction on substantially the same facts as he presents to the Court here. *See Kidd v. Director Federal Bureau of Prisons*, 2:18-cv-00130-O (ECF No. 2). That case was transferred to the Amarillo Division later that year. *See Kidd v. Director Federal Bureau of Prisons*, 2:18-cv-00161-Z-BR, Motion for Emergency Injunction (ECF No. 2) (injunctive relief denied and appeal dismissed for want of prosecution).

4

peaceful death as soon as possible" on account of the psychological toll the purported abuse has taken on him. Motion for Euthanasia ¶¶ 6-12, at 4-9, filed July 1, 2019 (ECF No. 8). In the third motion, Plaintiff asks the Court for an emergency hearing that he anticipates will establish the level of danger Plaintiff faces in the TDCJ. *See* Motion for Emergency Hearing ¶ 5, at 5, filed August 15, 2019 (ECF No. 11). In the fourth motion, filed last week, Plaintiff asks the Court to expedite its review of his Motion for TRO because his "life, [sic] and safty [sic] **continue** to be in extreme danger." Motion for Expedited Review of Plaintiff's Motion for Temporary Restraining Order 2, filed January 27, 2020 (ECF No. 13) (emphasis in original).

### LEGAL STANDARD

A federal court sitting in equity has power to issue a TRO. FED. R. CIV. P. 65. The standard for a TRO is generally the same as the standard for a preliminary injunction. *See May v. Wells Fargo Home Mortg.*, 2013 WL 2367769, at *1 (N.D. Tex. May 30, 2013) (Fitzwater, C.J.) (quoting *Asadoorian v. Travis*, 2011 WL 2224984, at *1 (D. Mass. June 7, 2011)). The standard for a preliminary injunction consists of four factors that Plaintiff must establish: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). A TRO, like all injunctive relief, is an extraordinary remedy requiring the applicant to unequivocally show the need for its issuance. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (internal citations and quotations omitted), *cert. denied*, 134 S. Ct. 1789 (2014). The party moving for a TRO must carry the burden as to *all*

four elements before a TRO may be considered. *Cf. Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (internal quotations and citations omitted).

ANALYSIS

The Court's analysis of the Motion for TRO tracks the four factors listed above. Analysis of the first factor — "substantial likelihood of success on the merits" — is complicated by the fact that Plaintiff asserts that the Motion for TRO itself constitutes "the merits." *See* Complaint § 5, at 4. Plaintiff's assertion is logically untenable: to adjudicate the Motion for TRO, the Court must decide if Plaintiff is likely to succeed on . . . the Motion for TRO.

Logicians from Aristotle to Bertrand Russell — not to mention the Supreme Court of the United States — do not approve of such a logical Möbius strip.[5] When, as here, the Plaintiff needs to satisfy all four criteria, failure to succeed on *any* of the four criteria automatically results in "failure to succeed." *See, e.g., Voting for America, Inc. v. Steen*, 732 F.3d at 386. Therefore, if the Plaintiff fails to satisfy even one TRO factor, the Court may logically conclude that it fails to meet its burden for granting the TRO regardless of success on the other prongs.[6]

After considering Plaintiff's Motion for TRO, all the exhibits thereto, and the tortuous procedural history of this case, the Court FINDS that: (1) Plaintiff is not likely to suffer irreparable harm in the absence of a TRO; (2) the balance of harms weighs against Plaintiff; and (3) granting

---

[5] *Compare* 2 ARISTOTLE, PRIOR ANALYTICS, ch. 16, ll. 64b28-65a26 (Robin Smith trans., Hackett Classics ed. 1989) (350 B.C.); BERTRAND RUSSELL, INTRODUCTION TO MATHEMATICAL PHILOSOPHY 71 (1919), *with King v. St. Vincent's Hosp.*, 502 U.S. 215, 222 (1991) ("But the hospital's argument does not convince. While it invokes the significance of context, its conclusion rests on quite circular reasoning."); *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990) ("The difficulty with petitioners' claim is that in a sense it begs the question . . . ."). With a Möbius strip, the user continuously and linearly traces out all points on every side but ends up where she began. *See Möbius Strip, in* ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/science/Mobius-strip (last visited Feb 14. 2020).

[6] Incidentally, this result holds true *mathematically* even if one of the criteria contains an unknown or non-zero value. Expressed in the language of symbolic logic, $\prod_1^{n-1} p_n = 0 \Rightarrow \prod_1^n p_n = 0, \forall_p \in \mathbb{R}$, where $p$ is the probability of success on factor $n$. In other words: If the product of a series of probabilities is equal to zero, then it is logically implied and logically necessary that multiplying by an additional probability will result in a product of zero for any probability that falls into a set of all the real numbers.

Plaintiff's requested TRO would disserve public policy. Even if Plaintiff were to succeed of *all three* of those TRO factors, the Court additionally FINDS that Plaintiff would be unlikely to prevail on the merits — even under the most liberal and generous construction of Plaintiff's claims. For the foregoing reasons, the Court DENIES the Plaintiff's Motion for TRO.

### A. Irreparability of Harm

Plaintiff depicts his years in the Clements Unit as a cross between the *Shawshank Redemption* and Franz Kafka's *The Castle*. He is sexually abused. He reports the abuse to a deaf and inimical prison bureaucracy. Prison bureaucrats retaliate with ever-increasing abuse that they either directly cause or allow to take place. Plaintiff becomes so desperate to escape the "psychological and emotional torture" that he repeatedly mutilates himself and escapes from a prison van. He petitions the federal courts for relief only to be shut down and forced to shuttle from prison to prison eighteen times in a furtive search of safety. Scarred, scared, and adrift in existential crisis, he is driven to petition the Court for an order of euthanasia.

If true, these allegations about past injury and targeted abuse are frightful. Yet neither prior conduct by third parties nor voluntary infliction of self-harm by itself suffices for showing the kind of *future* irreparable harm against which the extraordinary remedy of a TRO is meant to protect. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 107 (1983). To the contrary, Plaintiff must demonstrate to the Court that another party will cause him specific, future injury unless the Court grants Plaintiff's Motion for TRO. Speculative injury is not enough; there must be more than an unfounded fear on the part of the party moving for a TRO. *See Holland v. America Ins. Co. v. Succession of Roy,* 77 F.2d 992, 997 (5th Cir. 1985).

In previous cases filed with this Court based on substantially similar allegations, Plaintiff has struggled to articulate a specific risk of future harm he would face were the Court not to grant

7

injunctive relief. Those struggles continue, to Plaintiff's detriment, in his current Motion for TRO. Relatedly, Plaintiff's apparent refusal to file additional Step 1 grievances with TDCJ suggests that the alleged threats and attacks have abated *without* the requested relief — thus undermining his *irreparability* arguments. For these reasons, the Court FINDS that Plaintiff has not met his burden to prove that he is in danger of imminent and irreparable harm.

## B. Balance of Harms

Even if Plaintiff did face imminent and irreparable harm, the Court would need to weigh this harm against the harm the Defendants would incur were the Court to grants Plaintiff's requests for transfer in his Motion for TRO. Unlike Plaintiff's harm, the resulting harm to Defendants would not be speculative. TDCJ has transferred Plaintiff to at least eighteen (18) different prison units following his first Step 1 grievance more than a decade ago — and has applied myriad custodial solutions: with protective custody, without protective custody, administrative segregation, etc. Each transfer necessarily diverts TDCJ resources and personnel from other duties and tasks. Requiring a *nineteenth* transfer — possibly into federal custody — would deny TDCJ of the right to incarcerate an inmate and to employ what in its specialized assessment are the appropriate remedies to protect said inmate. Mandating such a transfer even though Plaintiff has not exhausted his administrative remedies would deprive Defendants of an opportunity to address Plaintiff's needs directly — a responsive action that TDCJ's eighteen transfers and repeated investigations into Plaintiff's grievances suggest would continue to be forthcoming. Identifying only speculative future harm on Plaintiff's side of the balance and multiple predictable harms on the Defendants' side of the balance, the Court FINDS that Plaintiff's Motion for TRO does not meet Plaintiff's burden to prove the third required factor of TRO analysis.

### C. Public Policy

A strong public constitutional interest adheres to preventing state governments from inflicting unconstitutionally cruel and unusual punishments on citizens of the United States. *See* U.S. CONST. amend. VIII (prohibiting federal government from imposing such punishments); *Robinson v. California*, 370 U.S. 660 (1962) (incorporating the Cruel and Unusual Punishments Clause against the states). Here, the Court identifies that public constitutional interest in ensuring that TDCJ does not target an inmate with the severely degrading, wholly arbitrary, patently unnecessary, and socially abhorrent types of abuse that Plaintiff asserts have occurred almost continuously since at least 2005. *Cf. Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) (Brennan, J., concurring) (identifying four characteristics of state punishment that collectively hallmark it as cruel and unusual). That said, the Court cannot identify any evidence presented by Plaintiff that substantiates his claims of abuse — actual or speculative.

The Court also notes the strong public interest in efficient use of judicial resources. The Supreme Court held in 1971 that prisoners had no obligation to exhaust administrative remedies before filing a case in federal court. *See Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (per curiam). As prisoner litigation increasing swamped the federal courts over the next two decades, Congress sought to bring the litigation under control by "invigorat[ing]" the types of mandatory exhaustion provisions that the Supreme Court had struck down in *Wilwording*. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). The first step came with passage in 1980 of the *Civil Rights of Institutionalized Persons Act*, wherein Congress authorized federal district courts to stay § 1983 actions for a limited time in the "interests of justice" while a prisoner exhausted "such plain, speedy, and effective administrative remedies as are available." 42 U.S.C. § 1997e (1994). Having failed to stem the tide of prisoner litigation by giving the federal district courts *discretionary* authority to stay

pending administrative exhaustion, Congress and President of the United States William Jefferson Clinton in 1996 made such administrative exhaustion *mandatory* with enactment of the *Prison Litigation Reform Act*. *See* Pub L. 104-134, 110 Stat. 1321 (1996), *codified at* 42 U.S.C. § 1997e ("PLRA"); *Woodford v. Ngo,* 548 U.S. 81, 85 (2006); *Porter v. Nustle,* 534 U.S. at 524 (recognizing that Congress intended PLRA "to reduce the quantity . . . of prisoner suits").

Plaintiff has not exhausted the administrative resources available to redress his grievances within TDCJ. To his credit, he has vigorously and persistently pursued his grievances part way, writing up at least six Step 1 grievance forms since December 2017 on the present allegations[7] and submitting at least four of those Step 1 grievance forms to prison officials.[8] Yet he has failed to pursue his available administrative remedies to completion.

When TDCJ sought to investigate Plaintiff's initial Step 1 grievance form in December 2017 and January 2018, Plaintiff "refused to cooperate with the investigation." Motion for TRO at 41. After TDCJ consequently decided not to act on that grievance, Plaintiff immediately filed a Step 2 grievance form but "failed to present additional information" as the form required. *See* Motion for TRO at 43. When Plaintiff repeated his allegations a couple months later in April 2018, TDCJ went beyond its legal requirements and reinvestigated the redundant allegations. *See* Motion for TRO at 36. It also granted Plaintiff his requested relief of granting him a housing change. *See id.* Nevertheless, Plaintiff submitted a Step 2 grievance in August 2018 without presenting any

---

[7] *See* Motion for TRO at 40-41 (Step 1 grievance dated December 12, 2017); Motion for TRO at 37-38 (Step 1 grievance dated Apr. 5, 2018); Motion for TRO at 45-46 (Step 1 grievance dated February 26, 2019); Motion for TRO at 50-51 (Step 1 grievance dated February 28, 2019); Motion for TRO at 55-56 (Step 1 grievance dated March 29, 2019); Motion for TRO at 60-61 (Step 1 grievance dated April 2, 2019).

[8] The Step 1 grievance forms Plaintiff dated on February 28, 2019 and on April 2, 2019 do not have any "date received" stamp or grievance code that receiving prison officials normally assign to a submitted grievance form. *See* Motion for TRO 50-51; *id.* at 60-61. The Step 1 grievance form dated April 2, 2019 is filled out in the "Grievance Response" box, but the text appears to be written in a script identical to Plaintiff's handwriting, a similarity that suggests that Plaintiff rather than a prison official may in fact have written the purported grievance response. *See* Motion for TRO at 61.

10

additional evidence as the form required. *See* Motion for TRO at 35-36. When Plaintiff wrote a flurry of four Step 1 grievances in less than five weeks from February 28, 2019 to April 2, 2019, TDCJ again investigated once again before returning the other forms as redundant. *See* Motion for TRO at 46, 56 & 67.[9] Plaintiff had an opportunity to file another Step 2 grievance, but he never submitted it.[10] The Court therefore is forced to conclude that Plaintiff has not exhausted his available administrative remedies as the PLRA requires.

In summary, Plaintiff offers no evidence that the public interest in strict enforcement of the Cruel and Unusual Punishment Clause is at risk if the Court does not grant his requested relief. On the other hand, the public interest in efficient use of judicial resources cuts against a movant prisoner who, like Plaintiff, has not exhausted his available administrative remedies before he sues in federal court. Considering the foregoing, the Court must FIND that Plaintiff does not satisfy the legal requirement that a TRO only be granted if it is in the public interest.

### D. Likelihood of Success on the Merits

As discussed above, Plaintiffs assertion that his Motion for TRO itself constitute the "merits" complicates the Court's analysis of the "likelihood of success" prong of the TRO analysis. To avoid further confusion wrought by Plaintiff's circular assertion, the Court analyzed the remaining three factors and found that all three cut against granting Plaintiff his requested relief. As a matter of logic and jurisprudence, the Court could rest on its analysis of the remaining three prongs: Plaintiff cannot obtain his requested relief even if he somehow were able to succeed on the merits of his case. Yet to ensure that it has given Plaintiff full consideration, the Court in the following paragraph examines

---

[9] Since Plaintiff appears never to have submitted the Step 1 grievance form he dated on February 28, 2019, see note 7 *supra*, there is no official TDCJ response on that form. *See* Motion for TRO 51.

[10] Plaintiff submits to the Court three written, responsive Step 2 grievances in his Motion for TRO, but none of these forms contains a date received stamp. *See* Motion for TRO 52-53; *id.* at 57-58; *id.* at 62-63.

11

whether Plaintiff's case would be likely to succeed on the merits even if the Court were to liberally construe his Complaint as encompassing the underlying conduct which he alleges has occurred since 2005.

The Court does not need to conjecture as to whether Plaintiff would be likely to succeed on the merits even with such an expansive construal of the underlying case, because the Court *already* has adjudicated substantially similar claims that Plaintiff brought before the Court. As noted in the background section above, Plaintiff in 2006 and again in 2018 unsuccessfully petitioned the Court for injunctive relief to stop the vicious abuse he alleges had occurred up to those points in time.[11] He repeated the same claims in each instance and argued, as he does here, that he was in imminent and grave danger at the hands of gang members and prison guards. Importantly, he in both instances sought, as he does here, to be transferred to allegedly safer housing. The Court dismissed the 2006 case without prejudice for failure to prosecute, but it *denied* Plaintiff's requested injunctive relief in 2018. Plaintiff appealed the judgment to the United States Court of Appeals for the Fifth Circuit, but that court dismissed Plaintiff's appeal for want of prosecution.

Nothing in Plaintiff's six new Step 1 grievances, four Step 2 grievances, or Motion for TRO suggests to the Court that the alleged violence and risk have changed in intensity or kind since the Court and the Fifth Circuit looked at Plaintiff's case in 2018. As such, the Court must entertain doubts that even liberally construing Plaintiff's Complaint in this case would lead to a different result than it did in 2018, i.e. that Plaintiff now would substantively prevail on the merits. The Court therefore must FIND that Plaintiff also fails to satisfy the first requirement for granting a TRO.

---

[11] In 2006, Plaintiff filed a case based on the same allegations in *Kidd v. Livingston et al*, 2:06-cv-00205-J-BB (dismissed without prejudice for failure to prosecute). In 2018, Plaintiff filed in the Wichita Falls Division a Motion for Emergency Injunction on substantially the same facts as he presents to the Court here. *See Kidd v. Director Federal Bureau of Prisons*, 2:18-cv-00130-O (ECF No. 2). That case was transferred to the Amarillo Division later that year. *See Kidd v. Director Federal Bureau of Prisons*, 2:18-cv-00161-Z-BR, Motion for Emergency Injunction (ECF No. 2) (injunctive relief denied and appeal dismissed for want of prosecution).

Because Plaintiff has failed to meet *any* of the four factors required under the relevant TRO standard, the Court hereby ORDERS that (1) Plaintiff be transferred back to the Clements Unit; and (2) his claim for injunctive relief or issuance of a TRO is DENIED. As Plaintiff's Complaint only encompasses his request for injunctive relief, his Complaint is DISMISSED with prejudice as frivolous.[12]

**SO ORDERED.**

February 14, 2020.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

---

[12] A claim is frivolous if it lacks an arguable basis in law or in fact. *Booker v. Koonce*, 2 F.3d 114, 115 (5th Cir. 1993); *see Denton v. Hernandez*, 504 U.S. 25 (1992). To determine whether a complaint is frivolous under 28 U.S.C. § 1915(d), the Court must inquire whether there is an arguable "'factual and legal basis of constitutional dimension for the asserted wrong.'" *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985) (quoting *Watson v. Ault*, 525 F.2d 886, 892 (5th Cir. 1976)). The review of a complaint for *factual* frivolousness nevertheless is quite limited and "only appropriate in the limited class of cases wherein the allegations rise to the level of the irrational or the wholly incredible," not just to the level of the unlikely. *Booker*, 2 F.3d at 114. Nor is *legal* frivolousness synonymous with mere unlikeliness. The Supreme Court of the United States and the United States Court of Appeals for the Fifth Circuit repeatedly counsel district courts against dismissing petitions that have some chance of success. *See, e.g., Denton v. Hernandez*, 504 U.S. 25 (1992); *Neitzke v. Williams*, 490 U.S. 319, 329 (1989); *Booker*, 2 F.3d at 116. That caution notwithstanding, a "claim against a defendant who is immune from suit is frivolous because it is based upon an indisputably meritless legal theory. *See Neitzke*, 490 U.S. at 327; *Booker*, 2 F.3d at 116.